**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

GEOVANI M.-O.,                                          :
                                                        :
                    Petitioner,                         :          Civ. No. 20-5053 (KM)
                                                        :
          v.                                            :
                                                        :
THOMAS DECKER, *et al*.,                                :          **OPINION**
                                                        :
                    Respondents.                        :
                                                        :

---

**KEVIN MCNULTY, U.S.D.J.**

## I.      INTRODUCTION

Petitioner, Geovani M.-O.,[1] is an immigration detainee currently held at the Hudson County Correctional Facility, in Kearny, New Jersey. He is proceeding by way of counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (DE 1.) The petition seeks Petitioner's immediate release or, in the alternative, a preliminary injunction. (*Id.* at 20.) Respondents oppose the petition. (DE 11.) Pursuant to Local Civil Rule 78.1, this matter is decided without oral argument. For the reasons set forth below, the petition will be granted insofar as it seeks a preliminary injunction requiring Petitioner's temporary release. This decision should not be taken as signifying a result in any other individual case; rather, it is a reflection of the unique circumstances present in this particular case.

---

[1]      Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified herein only by his first name and last initial.

## II.    BACKGROUND

**A.    COVID-19**

On March 11, 2020, the World Health Organization officially declared COVID-19 as a pandemic. *See* Ctrs. for Disease Control and Prevention, *Situation Summary*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last visited May 15, 2020). In only a few short months since that declaration, the rapidly spreading virus has infected more than 1,300,000 people in the United States and resulted in over 83,000 deaths. *See* Ctrs. for Disease Control and Prevention, *Cases in U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited May 15, 2020).

This infectious disease is spreading "very easily and sustainably between people." *See* Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 15, 2020). It spreads "mainly through close contact [within about six feet] from person-to-person in respiratory droplets" and from contact with contaminated surfaces." *See id.* The Centers for Disease Control and Prevention ("CDC") has identified certain groups of individuals who are deemed to be at "higher risk for severe illness" if they contract COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 15, 2020). These high risk individuals include, but are not limited to, those who are over 65 years of age, have asthma, diabetes, or serious heart conditions. *See id.*

For those in correctional and detention facilities, the virus presents "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments[.]" *See* Ctrs. for Disease Control and Prevention,

*Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited May 15, 2020). This close proximity heightens the potential that COVID-19 will spread. *See id.* Moreover, the "ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations." *See id.* The stark reality is that "avoiding exposure to COVID-19 is impossible for most detainees and inmates." *Cristian A.R. v. Decker*, Civ. No. 20-3600, 2020 WL 2092616, at *2 (D.N.J. Apr. 12, 2020).

## B.     Background

### i.     *Procedural History*

Petitioner is a 39-year-old native and citizen of Honduras. (DE 11-6 at 2.) He arrived in the United States on or about July 9, 2005 without authorization. (*Id.*) Upon his arrival, he was issued a Notice to Appear that charged him with removability and placed him into removal proceedings. (*Id.*) He was released on his own recognizance. (*Id.*) On September 29, 2005, Petitioner failed to appear for his immigration court hearing and an Immigration Judge ordered him removed from the United States *in absentia*. (DE 11-7.)

Petitioner has remained in the United States since his arrival in 2005. (DE 5 at 6.) He is married to a United States citizen and has two children who are also United States citizens. (*Id.*; DE 1-6 at 1.) On March 1, 2020, Petitioner was arrested following an argument with his 13-year-old stepson. (DE 1-6 at 2.) He was charged with two misdemeanor offenses. (*Id.*) After his arrest, Petitioner was released on his own recognizance and his charges remain pending. (*Id.*) He has no other criminal history. (DE 11-8 at 5.)

On March 3, 2020, Petitioner was taken into custody by Immigration and Customs Enforcement ("ICE"). (*Id.*) He is being detained at Hudson County Correctional Facility ("HCCF") pursuant to a final order of removal under 8 U.S.C. § 1231(a). (DE 11 at 6.) On March 12, 2020, he filed motion to reopen his removal proceedings. (DE 11-9 at 1.) His request was denied on April 14, 2020. (*Id.*) Petitioner is appealing this decision. (DE 12-3 at 15–18.)

On April 24, 2020, Petitioner filed the instant habeas petition pursuant to 28 U.S.C. § 2241. (DE 1.) He seeks release from custody based upon alleged unconstitutional conditions of confinement and inadequate medical care. (*Id.*) On April 27, 2020, Respondents filed opposition to the petition. (DE 11.) Petitioner thereafter filed a reply. (DE 12.) Petitioner also filed a supplemental submission. (DE 14.)

ii.     *Petitioner's Health*

Petitioner has been treated for type 2 diabetes since October 2016. (DE 12-3 at 23.) His personal physician indicates that since his diagnosis, Petitioner has been taking medication twice a day, testing his glucose levels three times a day, and following a strict low carbohydrate diet. (*Id.*) Petitioner's physician states that individuals with type 2 diabetes have an elevated risk of developing and contracting any illness due to a lower immune system. (*Id.*) He opines that Petitioner is at high risk of contracting COVID-19 and should be quarantined at home where his risk of exposure is lower. (*Id.*)

The declaration of Ms. Bianca Granados, who represents Petitioner in his immigration proceedings, states that Petitioner is having difficulty with diabetes while confined at HCCF. (DE 1-6 at 2–3.) Petitioner has reported that, on several occasions, it has taken him several days to be seen by a doctor. (*Id.* at 2.) Occasionally, his meals are not provided to him at a normal time (and one time allegedly he did not receive a meal at all), which causes his blood sugar levels to

destabilize and places his health at risk. (*Id.* at 2–3.) Additionally, Petitioner informed Ms. Granados that his blood sugar is not being tested regularly and he is not being provided with a low-carbohydrate diet, as recommended by his personal physician. (*Id.* at 3.) He is supposed to exercise to help regulate his blood sugar but is unable to do so because he is confined to his cell 22 hours a day. (*Id.*)[2] On one occasion, while detained, Petitioner's blood sugar levels became so unstable that he required an insulin injection for the first time in his life. (*Id.*)

Petitioner also provides the declarations of Dr. Robert Greifinger who reviewed the Petitioner's medical history. (DE 1-1 at 12.) Dr. Greifinger states that Petitioner's health condition places him at higher risk for complications if he is exposed to COVID-19. (DE 1-1 at 12.) Dr. Greifinger submits that "the only way to protect [Petitioner] from serious harm or death is to release him from detention so that he may practice social isolation and heightened hygiene." (DE 12-2 at 2.)

## C.    Conditions at HCCF

### i.    *Respondents' Evidence Regarding the Conditions at HCCF*

To describe the measures HCCF has implemented to combat the spread of COVID-19, Respondents provide the declaration of Ron Edwards, the Director of the Hudson County Department of Corrections and Rehabilitation.[3] (DE 14-1.) Mr. Edwards states that since March 2020, HCCF has taken various measures to ensure the health and safety of detainees during the COVID-19 outbreak. (*Id.* at 3.) Each housing unit is now on a "Restrictive Schedule" which only permits detainees outside of their cells for two 30-minute periods per day. (*Id.*) These 30-minute

---

[2]    To the extent that this declaration contains hearsay, a court may consider hearsay evidence at the preliminary injunction stage. *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir. 2004).

[3]    At the time Respondents filed their brief, they provided the Fourth Amended Declaration of Mr. Edwards. (DE 11-5.) Since that time, Petitioner has provided a copy of Mr. Edwards' updated Fifth Amended Declaration. (DE 14-1.)

recreation periods have been staggered so that only two detainees are permitted to leave their cell area at a time, in order to allow room for social distancing. (*Id.* at 7.) Detainees "do not mingle during recreation time." (*Id.*)  The recreation areas are being "cleaned continuously during a 16-hour period during the day." (*Id.* at 3–4.) Housing units are sanitized no less than three times per day. (*Id.* at 4.) Detainees are provided with two bars of soap each, but additional soap is available upon request. (*Id.* at 9.) Detainees also have unlimited access to water and are provided with disinfectant wipes. (*Id.*) All detainees have also been provided with surgical masks, and all staff have been provided with Personal Protective Equipment. (*Id.* at 7, 11.)

HCCF has suspended all tours, volunteer services, and visitation. (*Id.* at 5–6.) Any facility, staff members, or vendors coming into HCCF must have their temperatures screened by a medical professional prior to entering the facility. (*Id.* at 5.) Anyone with a temperature over 100 degrees Fahrenheit is not permitted to enter. (*Id.*) Staff and detainees have also been advised on best practices to prevent the spread of COVID-19, including the importance of hand washing. (*Id.*) HCCF has posted CDC and Department of Health posters with this information throughout the facility. (*Id.*)

HCCF has established a designated housing unit as a quarantine area for detainees who are suspected of having, or who have tested positive for, COVID-19. (*Id.* at 6.) Medical personnel are visiting each cell twice a day to check on every detainees' medical and mental health. (*Id.* at 7.) Meals are provided to detainees within their cells so that they do not congregate for meal time. (*Id.* at 8.) HCCF staff are encouraging inmates and detainees to avoid congregating. (*Id.* at 8.)

HCCF is following guidance issued by the CDC and World Health Organization ("WHO"), as well as local guidelines, on testing and treatment for COVID-19. (*Id.* at 8.) Detainees who exhibit symptoms consistent with COVID-19 are evaluated "immediately" and any detainee who

feels symptoms can make daily sick calls as needed. (*Id.*) A detainee may make a sick call "via tablet or to a nurse that comes in the unit twice a day." (*Id.*)

If a detainee tests positive for COVID-19, but does not require hospitalization, the detainee will be isolated in a designated isolation area with other individuals who have tested positive. (*Id.*) Detainees' vitals are monitored on a daily basis and they are evaluated for hospital placement. (*Id.* at 8–9.) Detainees who are symptomatic and awaiting test results are placed in quarantine, where they remain for 14 days. (*Id.* at 9.) Individuals who are asymptomatic but have been exposed to someone with confirmed COVID-19, are housed together in a practice referred to as "cohorting." (*Id.*) If, after fourteen days, no new cases develop, cohorting is discontinued. (*Id.*) Any detainees with health conditions identified by the CDC as placing them at higher risk of developing serious illness of COVID-19 are being housed separately. (*Id.* at 11.)

As of 1:00 p.m. on May 4, 2020, 13 detainees have tested positive for COVID-19; 27 county and federal inmates have tested positive; and 94 staff members have tested positive. (*Id.* at 10.) Tragically, there have been four fatalities, all among the staff: one member of the HCCF correctional staff, the former facilities commissary direction, and two nurses who worked at HCCF have died from complications of COVID-19. (*Id.*) HCCF has tested 88 inmates and detainees for COVID-19. (*Id.* at 10.) Of those 88 people tested, 40 have tested positive, and 38 have made a full recovery. (*Id.*) None of those individuals have required hospitalized. (*Id.*) Approximately 150 HCCF law enforcement officers have been tested for COVID-19. (*Id.*) Ninety-four of them have tested positive, and 81 have recovered and returned to duty. (*Id.*)

    *ii.  Petitioner's Evidence Regarding the Conditions at HCCF*

With regard to the conditions Petitioner is currently experiencing at HCCF, he provides the declaration of Ms. Granados. (DE 1-6.) Petitioner reported to her that he is currently being housed

alone in his cell, but has, at times, had a cellmate. (*Id.* at 3.) Petitioner's cell is never cleaned by

staff. (*Id.*) If Petitioner wants to clean his cell himself, he must do so with a broom, mop, and

Pinesol, which is shared among all the detainees. (*Id.*) Petitioner has also not been provided with

disinfecting wipes or any other disinfectant products to use. (*Id.*) Petitioner has to buy his own

soap and personal hygiene products from the commissary, but since his commissary account is

currently closed, he states that he will run out of soap soon. (*Id.*)

Petitioner states that he is allowed out of his cell twice per day. (*Id.*) During those times,

he is surrounded by other detainees. (*Id.*) Additionally, he indicates that many of the detainees are

not wearing their face masks when they are in the common areas. (*Id.*) Petitioner further provides

that the common areas are only cleaned about once per day with Windex, but staff are "not

disinfecting the areas." (*Id.*)

As further evidence of the conditions at HCCF, Petitioner provides the declarations of

attorneys at The Bronx Defenders, and The Legal Aid Society who have interacted with recently

detained individuals at HCCF. (DE 1-3; DE 1-5.)  These declarations indicate that detainees are

having difficulty accessing prompt medical attention, personal hygiene products, disinfectant, and

cleaning supplies. (DE 1-3 at 3–4; DE 1-5 at 2–3.) The declarations also suggest an inability of

detainees to adhere to CDC guidelines such as social distancing, hand washing, and cleaning of

high touch surfaces. (DE 1-3 at 3–4; DE 1-5 at 4.) Petitioner also submits the declaration of an

attorney at the Health Justice Program at New York Lawyers to the Public Interest who delineates

the problems that inmates and detainees have had accessing medical care at HCCF in the past. (DE

1-4.)

### III.    JURISDICTION

Generally, conditions of confinement claims are brought pursuant to 8 U.S.C. § 1983. *See Camacho Lopez v. Lowe*, Civ. No. 20-563, 2020 WL 1689874, at *4–5 (M.D. Pa. Apr. 7, 2020). However, where an individual seeks "immediate or more speedy release," he is asserting a remedy available through a habeas petition. *See Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973). A habeas petition is the process by which an individual may challenge the "fact or length" of his confinement. *See id.* To date, the United States Supreme Court has not expressly stated whether a conditions of confinement claim may be raised through a habeas corpus petition. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017) ("[W]e have left open the question whether [individuals] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."); *see also Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser*, 411 U.S. at 499 ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."). However, federal courts of appeals appear to have condoned such challenges. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242-44 (3d Cir. 2005); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978). Moreover, recent caselaw within this circuit has been largely consistent in finding that an immigration detainee may challenge the conditions of his confinement through a § 2241 petition. *See Carmen R. v. Decker*, Civ. No. 20-3875, 2020 WL 2029337, at *12 (D.N.J. Apr. 28, 2020) (collecting cases); *Thakker v. Doll*, Civ. No. 20-480, 2020 WL 2025384, at *2 (M.D. Pa. Apr. 27, 2020) (collecting cases). Given these considerations, I agree with the line of

cases that have permitted conditions of confinement claims to proceed through a habeas petition and find that Petitioner may pursue his claims through the present petition.[4]

## IV.   LEGAL STANDARD

The relief Petitioner seeks is his release from custody. (DE 1 at 37.) At this time, I will analyze Petitioner's request under the standard for a preliminary injunction. *See Hope v. Warden York Cty. Prison*, Civ. No. 20-1784, 2020 WL 1922372, at *2-4 (3d Cir. Apr. 21, 2020); *Ousman D. v. Decker*, Civ. No. 20-2292, 2020 WL 1847704, at *4 (D.N.J. Apr. 13, 2020). In order to obtain a preliminary injunction, a petitioner must provide a "threshold" showing of two critical factors: (1) a likelihood of success on the merits of his claim; and (2) that he is "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). A likelihood of success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." *See id.* Additionally, "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* at 178 (quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). If these two "gateway factors" are met, then the Court considers the remaining two factors which aim to balance the equities of the parties: "the possibility of harm to other interested persons from the grant or denial of the injunction," and "the public interest." *Id.* at 176 (quoting *Del. River Port Auth. v. Transamerican Trailer Transport,*

---

[4]     I also note that under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that this custody violates the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). A petitioner may seek § 2241 relief only in the district in which he is in custody. *United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009). Thus, this Court has jurisdiction over Petitioner's claims as he is detained within this district and alleges that his detention violates the Constitution.

*Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The Court considers, "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

## V.   DISCUSSION

Petitioner argues that his continued detention violates his substantive due process rights under the Fifth and Fourteenth Amendment. (DE 1 at 19–20.) His argument appears to arise under two theories: that his conditions of confinement amount to punishment and that HCCF is being deliberately indifferent towards his serious medical needs. (DE 5 at 21–30.) Based upon the particular circumstances presented in this case, I find that Petitioner has met the standard for a preliminary injunction.

## A.   Likelihood of Success on the Merits

### i.   *Conditions of Confinement Claim*

Petitioner argues that his continued detention under the current "dangerous and unsanitary" conditions of confinement at HCCF constitute unlawful punishment, thereby violating his due process rights. (DE 5 at 22.) He argues that his present conditions are highly dangerous due to the virulence of the outbreak at HCCF and the failure of the facility to adequately protect medically vulnerable individuals, such as himself. (*Id.* at 23.) Specifically, Petitioner points to his inability to practice social distancing, access basic hygiene products, and clean commonly touched surfaces in communal areas. (*Id.*) He submits that these conditions lack a reasonable relationship between the government's need to detain him and his serious medical condition. (*Id.* at 24–25.) Respondents maintain, however, that HCCF has undertaken significant measures to prevent the spread of COVID-19. (DE 11 at 13–14.) Respondents argue their legitimate interests in preventing Petitioner from absconding and protecting the public are not outweighed by Petitioner's present conditions

11

of confinement, especially in light of the preventative measures they have implemented. (DE 11 at 14.)[5]

An immigration detainee's conditions of confinement claim is properly analyzed under the Due Process Clause of the Fifth Amendment. *See Sharkey*, 928 F.3d at 306–07 (holding that immigration detainees are entitled to the "same due process protections" as pretrial detainees). Under the Fifth Amendment's Due Process Clause, "a detainee may not be punished prior to an adjudication of guilt." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). In order to determine whether a challenged condition amounts to punishment, a court looks at whether that condition "is reasonably related to a legitimate government objective." *Sharkey*, 928 F.3d at 307. If it is not, then a court may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflected upon detainees *qua* detainees." *Id.* (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).

Whether a condition of confinement is reasonably related to a legitimate government objective turns on whether the condition serves a legitimate purpose and is rationally related to that purpose. *See Hubbard*, 538 F.3d at 232. A petitioner can demonstrate that a challenged condition amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials," if there is no "alternative purpose to which [the condition of confinement] may rationally be connected is assignable for it," *or* if the condition is "excessive in relation to the

---

[5]     Respondents argue that Petitioner is properly detained pursuant to 8 U.S.C. § 1231(a) and that his detention is mandated through the pendency and conclusion of his removal proceedings. (DE 11 at 12.) Petitioner does not dispute that he is detained pursuant to § 1231(a), but argues that the statutory basis for his detention is not dispositive of his conditions of confinement claim. (DE 11 at 6 n.1.) I agree with Petitioner that the fact of his authorized detention does not negate his argument that the conditions of his confinement may be unconstitutional, requiring conditions of release during the COVID crisis. *See E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019) (holding that immigration detainees are entitled to the same due process protections as pretrial detainees).

alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).

In the emerging case law that has developed within this district, courts have emphasized certain key factors in determining whether an immigration detainee's conditions of confinement amount to punishment during the current pandemic: namely, the detainee's health and the specific conditions at the facility at which he is detained. *See Carmen R. v. Decker*, Civ. No. 20-3875, 2020 WL 2029337, at *12 (D.N.J. Apr. 28, 2020)*; Thakker v. Doll*, Civ. No. 20-480, 2020 WL 2025384, at *8 (M.D. Pa. Apr. 27, 2020); *Rafael L.O. v. Tsoukaris*, Civ. No. 20-3481, 2020 WL 1808843, at *7-8 (D.N.J. Apr. 9, 2020). In the absence of guidance from the Supreme Court or the Courts of Appeals regarding how to handle conditions of confinement claims during a pandemic, "many courts have found that insufficient jail action in light of the virus can serve as a basis for release . . . while many others have found that, where the jail takes adequate precautions in light of a given petitioner's medical history, no such relief is warranted." *Cristian R. v. Decker*, Civ. No. 19-20861, 2020 WL 2029336, at *2 (D.N.J. Apr. 28, 2020).

Respondents urge the Court to follow the line of cases which have found that facilities have enacted appropriate measures to address the individual's health concerns. (DE 11 at 17–18.) However, none of the cases cited by Respondents involved detainees that were medically vulnerable. *See Jose D. M. v. Barr*, Civ. No. 20-4031, 2020 WL 1969893, at *6 (D.N.J. Apr. 24, 2020) (finding that petitioner had not indicated that he suffered from any serious underlying health conditions); *Jorge V. S. v. Green*, Civ. No. 20-3675, 2020 WL 1921936, at *4 (D.N.J. Apr. 21, 2020) (same); *Emerson O. C.-S. v. Anderson*, Civ. No. 20-3774, 2020 WL 1933992, at *6 (D.N.J. Apr. 22, 2020) (same); *Ousman D. v. Decker*, Civ. No. 20-2292, 2020 WL 1847704, at *10 n.11 (D.N.J. Apr. 13, 2020) (same).

Nevertheless, I recognize that there have been varying opinions among federal district courts regarding conditions of confinement claims during the COVID-19 pandemic. *Compare Jason Anthony W. v. Anderson*, Civ. No. 20-3704, ECF No. 22 (D.N.J. Apr. 17, 2020); *Cristian A.R.*, 2020 WL 2092616, at *1; *Rafael L.O.*, 2020 WL 1808843; *Thakker v. Doll*, Civ. No. 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); *Castillo v. Barr*, Civ. No. 20-605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Basank v. Decker*, Civ. No. 20-2518, 2020 WL 1481503 (S.D.N.Y.); *with Hassoun v. Searls*, Civ. No. 19-370, 2020 WL 1819670 (W.D.N.Y. Apr. 10, 2020); *Umarbaev v. Lowe*, Civ. No. 20-413, 2020 WL 1814157 (M.D. Pa. Apr. 9, 2020). The disparity in the caselaw underscores the highly fact specific nature of each case. *See Umarbaev*, 2020 WL 1814157, at *7. "The success of each petition will depend not only on the circumstances of the petitioner before the Court, but also on a rapidly changing landscape that includes the state of the COVID-19 pandemic, current conditions in ICE facilities, and the evolving response by ICE and facility officials to medical needs." *Id.*

Here, Petitioner suffers from diabetes which makes him particularly susceptible to severe illness if he contracts COVID-19. (DE 12-3 at 23.) The CDC provides that "[p]eople with diabetes whose blood sugar levels are often higher than their target are more likely to have diabetes-related health problems. Those health problems can make it harder to overcome COVID-19." *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 15, 2020) (providing that type 2 diabetes may place individuals at higher risk of severe illness from COVID-19). Indeed, Respondents do not appear to rebut Petitioner's evidence of his serious health condition. (DE 11 at 19.)

The declarations submitted by Petitioner indicate that, despite the best intentions and efforts of HCCF to follow CDC guidelines and protocol, detainees may still having difficulty adhering to the measures touted by the CDC as the best way to prevent contracting COVID-19. Petitioner indicates that he is detained in conditions where he lacks adequate access to basic hygiene products such as soap and disinfectant wipes, and where he is forced to share communal items that are not adequately cleaned or disinfected. (DE 1-6 at 3.) Although Petitioner is currently housed by himself, he must still share common areas with other detainees who are not wearing their masks and who may be infected. Moreover, Petitioner indicates the common areas are cleaned only about once per day.

As I have previously recognized in other cases, HCCF has enacted substantial measures to prevent the spread of COVID-19. *See Durel B. v. Decker*, Civ. No. 20-3430, 2020 WL 1922140, at *8 (D.N.J. Apr. 21, 2020); *Leandro R. P. v. Decker*, Civ. No. 20-3853, 2020 WL 1899791, at *7 (D.N.J. Apr. 17, 2020); *Jeferson V. G. v. Decker*, Civ. No. 20-3644, 2020 WL 1873018, at *8 (D.N.J. Apr. 15, 2020). Thus, I do not find that Respondents have an intent to punish Petitioner. But, the COVID-19 pandemic is a difficult and unparalleled time for all involved and jails were "not designed with pandemics in mind." *Sergio S.E v. Rodriguez*, Civ. No. 20-3982, 2020 WL 2111029, at *6 (D.N.J. May 4, 2020). Despite the laudable efforts by HCCF, it unfortunately seems that the danger to this Petitioner remains great; a large number of infections have occurred, and there have been fatalities. My decision here rests primarily on Petitioner's medical condition and the high danger of serious illness or death that he faces if infected.

I recognize that the government has legitimate objectives in detaining Petitioner during his removal proceedings, including preventing him from absconding. (DE 11 at 13.) However, given Petitioner's medical vulnerability and the conditions at HCCF, I find that Petitioner's conditions

of confinement are excessive in relation to the purpose of his detention. *See Bell*, 441 U.S. at 538. This is especially true given the other alternatives available to ICE to achieve their objectives. *See Thakker v. Doll*, Civ. No. 20-480, 2020 WL 1671563, at *8 (M.D. Pa. Mar. 31, 2020) ("We note that ICE has a plethora of means *other than* physical detention at their disposal by which they may monitor civil detainees and ensure that they are present at removal proceedings, including remote monitoring and routine check-ins." (emphasis in original)). Accordingly, I find that Petitioner has shown a likelihood of success on the merits of a conditions of confinement claim.

ii.    *Inadequate Medical Care Claim*

Petitioner next argues that Respondents have demonstrated a deliberate indifference towards his serious medical needs by failing to take adequate steps to protect high risk individuals in their custody. (DE 5 at 25–30.) Petitioner asserts that despite Respondents' knowledge of his diabetes, they have actually increased his health risks during this pandemic by failing to provide him with a low-carbohydrate diet or allowing him to follow glucose testing recommendations. (*Id.* at 28.) Respondents maintain, however, that the evidence demonstrates they have taken substantial steps to address the COVID-19 pandemic and to provide safe conditions for Petitioner. (DE 11 at 18–19.)

The applicable legal standard for an immigration detainee's inadequate medical care claim is that of deliberate indifference. *See Harvey v. Chertoff*, 263 F. App'x 188, 191 (3d Cir. 2008) (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581-85 (3d Cir. 2003)); *see also Camacho Lopez v. Lowe*, Civ. No. 3:20-CV-563, 2020 WL 1689874, at *7 (M.D. Pa. Apr. 7, 2020). To succeed on a claim of inadequate medical care, a petitioner must show: (1) "a serious medical need," and (2) "acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale*, 318 F.3d at 582. The Supreme Court has held that an official demonstrates

deliberate indifference where "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

"It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'" *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); *see also Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993) ("[T]he law is clear that simple medical malpractice is insufficient to present a constitutional violation.") Moreover, "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Rouse*, 182 F.3d at 197 (quoting *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)). In *Estelle v. Gamble*, the United Supreme Court held:

> Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 106.

Mere disagreement over proper medical treatment also generally does not establish deliberate indifference. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citing *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). "[W]hen medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017); *see also Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights").

Here, as to Petitioner's general claim regarding HCCF's failure to protect high risk individuals within their care, HCCF has, in fact, taken numerous steps to provide protections for detainees whose underlying conditions increase their vulnerability to an adverse reaction if infected. (DE 14-1.) Respondents point to their efforts to adhere to CDC guidance regarding testing, monitoring detainees on a daily basis, providing special housing for medically vulnerable detainees, isolating those who exhibits symptoms of COVID-19 or have tested positive, and providing ongoing medical treatment to sick detainees. (DE 11 at 19.) Although there may not yet be a perfect solution to protecting individuals from contracting this infectious disease, Respondents' actions do not demonstrate that they have recklessly disregarded the serious threat that COVID-19 poses.

As to Petitioner's specific contention regarding treatment for his diabetes, the record before the Court does not demonstrate that Respondents have acted with deliberate indifference. Petitioner relies on his personal physician's recommendation that Petitioner should be on a strict low-carbohydrate diet and checking his glucose levels regularly during the day. (DE 5 at 28.) However, this evidence does not establish more than disagreement over proper treatment. *See Spruill*, 372 F.3d at 235. Absent additional information, this Court cannot say that Petitioner has valid claim of medical mistreatment under the Eighth Amendment. Accordingly, Petitioner has not established a likelihood of success on the merits of his deliberate indifference claim.

Although Petitioner has failed to show a likelihood of success on the merits of his deliberate indifference claim, he has still demonstrated a likelihood of success on his conditions of confinement claim. Therefore, I find that Petitioner has met the first factor required for the grant of a preliminary injunction.

## B.      Irreparable Harm

The second threshold showing Petitioner must make in order to be granted a preliminary injunction is that he is "more likely than not" to suffer irreparable harm absent the relief requested. *See Reilly*, 858 F.3d at 179. Respondents argue that Petitioner's release will not ameliorate his risk of COVID-19 infection, given that he will be returning to the epicenter of the outbreak in New York and that he may not be able to access regular medical care safely. (DE 11 at 21.) However, Petitioner asserts that his continued detention in a facility where he cannot effectively practice social distancing, practice adequate hygiene, or avoid coming into contact with high touch surfaces that are not adequately cleaned, places him at serious risk of infection. (DE 5 at 32.) He submits that he has a detailed release plan which will enable him to access regular treatment from his personal physician, regularly monitor and control his blood sugar levels, and engage in social distancing, basic hygiene, and sanitization aimed to reduce his risk of infection. (DE 12 at 18.)

As described more fully above, Petitioner has established that despite HCCF's protocols, he remains unable to adhere to social distancing guidelines or practice an adequate level of personal hygiene. (DE 1-6.)  There is currently no guarantee against contracting COVID-19, even in the community at large. Correctional and detention facilities, however, present "unique challenges for control of COVID-19 transmission[.]" *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited May 15, 2020). Within facilities such as HCCF, detainees "cannot practically adhere to social distancing guidelines or the adequate level of personal hygiene," measures which have been "touted as the most effective means to thwart the spread of the virus." *Rafael L.O.*, 2020 WL 1808843, at *8. The continuing rise in the number of cases at HCCF underscore this point. Moreover, given

Petitioner's underlying health conditions, he is especially at risk of developing severe illness should he be exposed. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 15, 2020). Against this backdrop, it is apparent that Petitioner has demonstrated irreparable harm if his confinement at HCCC continues.

## C.     Balancing of the Equities

Finally, I consider the remaining two factors which aim to balance the equities of the parties: the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest. Respondents assert that there is a significant public interest in preventing Petitioner from absconding and in protecting the community, especially given Petitioner's pending charges. (DE 11 at 13.) Conversely, Petitioner submits that the grave risk to his health outweighs the government's interest in his physical detention. (DE 5 at 32.) He also asserts that the public has an overwhelming interest in minimizing the spread of COVID-19 and avoiding the additional burdens Petitioner would place on the healthcare system if he were to become seriously ill. (*Id.* at 35.)

Here, I do find that Respondents' have a legitimate interest in ensuring Petitioner does not abscond and does not commit any offenses while on release. Petitioner does not have any criminal convictions. He has two misdemeanor charges which remain pending and for which he has already been released on his own recognizance. Petitioner also has significant ties to the United States. He has lived here for the past 15 years and his United States citizen wife and children all live here. Petitioner indicates that if released, he will return to his home and continue to take care of his young family. (DE 1-6.)

Taking into consideration each parties' interests and the interests of the public, I believe these concerns can be appropriately balanced by releasing Petitioner to strict conditions of release including home confinement and electronic and telephonic monitoring. The specific conditions of his release are set forth in the Order accompanying this Opinion.[6] Thus, in balancing the equities, I find that they favor the grant of a preliminary injunction.

## VI.    CONCLUSION

For the foregoing reasons, the petition (DE 1) will be granted insofar as a preliminary injunction shall be issued. An appropriate Order accompanies this Opinion.

DATED: May 15, 2020

/s/ Kevin McNulty
_____
KEVIN MCNULTY
United States District Judge

---

[6]    Respondents' answer requests the opportunity to suggest conditions of release if the Court is inclined to grant such release. (DE 11 at 22.) Petitioner will be released on the conditions outlined in the accompanying Order. If modification is sought, counsel should attempt to agree, but if there is no such consent, the court will entertain letter applications for modification of conditions of release.